## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**JOHNNIE ROCHELL, JR.**

**PLAINTIFF**

**V.**                    **CASE No. 5:16-CV-5093**

**CITY OF SPRINGDALE, ARKANSAS and**
**DETECTIVE CODY ROSS**                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendants City of Springdale, Arkansas'

("Springdale") and Detective Cody Ross's[1] Motion for Summary Judgment (Doc. 51) and

Brief in Support (Doc. 52), Plaintiff Johnnie Rochell, Jr.'s Response in Opposition (Doc.

59), and Defendants' Reply (Doc. 65). For the reasons given below, the Motion is **MOOT**

**IN PART, GRANTED IN PART, AND DENIED IN PART.**

### I. BACKGROUND

On February 19, 2016, Detective Ross and several other police officers were

surveilling a house near Mr. Rochell's residence in Springdale, Arkansas. Detective Ross

was parked in a red, unmarked pickup truck against the curb, directly in front of Mr.

---

[1]  Other defendants were present in the lawsuit at the time the Motion for Summary Judgment was filed. However, the parties filed a Joint Stipulation of Dismissal (Doc. 61) of certain claims and defendants on August 28, 2017, the same day Plaintiff filed his Response to the Motion for Summary Judgment. The Joint Stipulation was somewhat unclear as to which claims were being dismissed and which were being preserved, so the parties filed an Amended Joint Stipulation of Dismissal (Doc. 64) on August 31, 2017. The Amended Joint Stipulation explained that all defendants were dismissed without prejudice except for Springdale and Detective Ross, and all claims were dismissed without prejudice except for excessive force, false arrest, and false imprisonment. See Order, Doc. 66. In the following Opinion and Order, the Court will rule on the merits of the Motion for Summary Judgment as they pertain to the remaining Defendants and causes of action, and will find as moot any claims that are discussed in the Motion, but that have been voluntarily dismissed.

Rochell's house. Detective Ross was not in uniform even though he was on duty. He was wearing jeans and a short-sleeved shirt, and he sported a beard.[2] While sitting in the truck, Detective Ross would periodically look through binoculars at the house he was surveilling, and then report what he observed to other officers who were in the vicinity, either over the radio or over a cell phone.

At some point, Mr. Rochell and his son arrived home and pulled into their driveway. Mr. Rochell immediately observed Detective Ross's truck parked in front of his house. He watched the truck for a short while. Then Mr. Rochell's son went across the street to a neighbor's house, and Mr. Rochell attempted to get Detective Ross's attention by waiving at him and trying to get him to roll down his window. Detective Ross testified that at that time, he was the only officer who had eyes on the house that was being surveilled, so he did not feel he could get out of his car to speak with Mr. Rochell. Again Mr. Rochell tried to get Detective Ross's attention by motioning him to roll down his car window, but Detective Ross, who was on his cell phone at the time, did not roll down his window, and instead held up his finger to Mr. Rochell, in an attempt to tell him to "hold on just a minute." (Doc. 53-7, p. 5). According to Mr. Rochell, Detective Ross then made another phone call, looked up, and "put his one finger up again." (Doc. 53-1, p. 5). Detective Ross also motioned for Mr. Rochell to come over to him, but Mr. Rochell shook his head "and said no," and then went inside his house. *Id.*

Detective Ross had the sense that Mr. Rochell was becoming concerned about his presence, so Detective Ross contacted Detective John Mackey, who was also in the

---

[2] Mr. Rochell in his deposition described Detective Ross as looking like "a rusty dusty bum." (Doc. 53-1, p. 8).

2

vicinity, with the intent of asking him to call police dispatch and warn them that they might soon receive a call from a concerned citizen (Mr. Rochell). According to Detective Ross, he had just gotten on the phone with Detective Mackey, and had started to say, "Will you call dispatch—" when he noticed Mr. Rochell walking toward the truck with an AR-15 rifle slung around his body. (Doc. 53-7, p. 6). Detective Ross does not recall whether the barrel of Mr. Rochell's rifle was pointed up or down, but he does confirm that the gun was resting on Mr. Rochell's back, "[s]uch that he would have to actually put his head through the sling" to take it off. *Id.* at 22. Mr. Rochell confirms that he "put [the strap of the rifle] over [his] head where the gun was on [his] back, the barrel . . . pointed down to [his] right side, the stock . . . pointed up towards his [left] shoulder." (Doc. 53-1, p. 6). Detective Ross also testified that Mr. Rochell never ran toward the truck or pointed the weapon at him. (Doc. 53-7, p. 23). More to the point, Detective Ross was asked during his deposition whether Mr. Rochell's hands *ever* touched his rifle during the entire encounter, and Detective Ross replied, "No, not that I recall." *Id.* at 22-23.

The two men dispute exactly when Detective Ross identified himself as a police officer. Detective Ross maintains that he had already pulled his badge from underneath his shirt and placed it on his chest *before* Mr. Rochell exited his house with his rifle. Detective Ross did so "thinking that if [Mr. Rochell] did come out on the porch again, he might see [him]—he might see [his] badge and then not really be concerned about it or at least relieve his concerns a little bit." *Id.* at 6. In Detective Ross's version of events, he had already placed the badge, which was on a chain, outside his clothing, resting on his chest, when he spotted Mr. Rochell walking through his front lawn, toward the pickup truck,

3

with the rifle slung across his back. When Mr. Rochell was about eight to twelve feet from the truck, Detective Ross claims that he exited the truck, drew his service weapon, and began shouting, "Police, drop the weapon!" *Id.* at 7. Detective Ross admits he shouted this even though Mr. Rochell was not "actually holding the weapon." *Id.* at 26.

Mr. Rochell's version of events is different. He claims that after he emerged from his house with his rifle on his back and began walking to the truck, Detective Ross suddenly jumped out holding a pistol and screaming, "Drop the fucking gun or I'll blow your fucking brains out! Drop the gun or I'm going to fucking kill you!" (Doc. 53-1, p. 6). Mr. Rochell avers that he put up his hands immediately, palms facing outward, even though Detective Ross did not identify himself as a police officer or display his badge. Mr. Rochell maintains that he had no idea who this man pointing a gun at him was and assumed that he might be "on drugs" or "selling drugs in front of [the] house." *Id.* Mr. Rochell also testified that when Detective Ross yelled at him to "drop the gun" and threatened to shoot him, Mr. Rochell did not drop the gun initially because he had no idea Detective Ross was a police officer. In Mr. Rochell's mind, there was no reason for him to drop the gun at that point because he "didn't do anything [wrong]" since "this is an open carry state," and he was "well within [his] rights to come out of [his] house with [his] firearm whenever [he] [felt] like it." *Id.* at 6-7. But from Detective's Ross's perspective, he was "in fear for his life" and "scared" when he saw Mr. Rochell approach. Detective Ross agrees that when he first commanded Mr. Rochell to drop the weapon, Mr. Rochell "froze and stood there, not being uncooperative by any means," but not dropping the weapon. (Doc. 53-7, p. 8).

Mr. Rochell testified that Detective Ross eventually pulled his badge from under his

4

shirt. At that point, Mr. Rochell realized that Detective Ross was a police officer, and he immediately complied with the command to drop his weapon. Mr. Rochell grabbed the strap that held the weapon with his left hand, pulled the strap over his head, passed the weapon to his right hand, and set it on the ground, holding both his hands in front of him. Detective Ross's account of how Mr. Rochell removed his weapon matches Mr. Rochell's. *See id.* at 27. In particular, Detective Ross observed that the way Mr. Rochell lifted the weapon over his head and placed it on the ground was "very slow[] and very correct—I mean he did it the correct way." *Id.*

After he placed his weapon on the ground, Mr. Rochell "took a step to [his] left over away from the weapon." (Doc. 53-1, p. 7). Detective John Brashear, who arrived at the scene around that same time, confirmed that he saw Mr. Rochell's rifle "approximately three feet on the ground from where Mr. Rochell was standing." (Doc. 53-10, p. 2). The rifle "ended up laying near a tree . . . . or even on the landscaping at the base of the tree," according to Detective Ross's testimony. (Doc. 53-7, p. 27).

Once Mr. Rochell placed his weapon on the ground and took a step away from it, he believes Detective Ross grew even more agitated than he had been before, yelling, "I'll fucking blow your brains out, get on the ground! I'll fucking kill you, get on the ground!" (Doc. 53-1, p. 7). Mr. Rochell testified that he started turning around in order to get to the ground, but was doing it very slowly, "not trying to get shot or anything like that." *Id.* Detective Ross advanced on Mr. Rochell and shoved him to the ground. *Id.* at 8. Detective Brashear confirms that when he arrived at the scene, he observed Detective Ross giving Mr. Rochell loud, verbal commands to get on the ground, and that at first, Mr.

5

Rochell "was just standing there," (Doc. 53-10, p. 2), but that eventually he saw Detective Ross "grabbing [Mr. Rochell] and putting him on the ground," *id.*, and doing so "forcefully," *id.* at 4.

Mr. Rochell alleges that once he was on the ground, with his hands behind his back and his rifle laying several feet away from him, Detective Ross "took his [own] gun"—a Glock 9-millimeter pistol—"and he pressed it behind [Mr. Rochell's] right ear," saying, "I'll blow your fucking brains out if you ever approach me like that again." (Doc. 53-1, p. 7). Mr. Rochell believed that, for some reason, Detective Ross seemed "more irate and just hyped up" after Mr. Rochell was on the ground than before, "which didn't make sense" to Mr. Rochell. *Id.* at 11. For his part, Detective Ross does not recall what he said to Mr. Rochell once he was on the ground. He only remembers "screaming at [Mr. Rochell]; [and] he was screaming at me." (Doc. 53-7, p. 29). Detective Ross admits that he pointed his gun at Mr. Rochell "when he was on the ground," at "[a]lmost point blank" range, *id.*, and that it was "[v]ery likely" that he placed the barrel of his pistol against Mr. Rochell, *id.* at 30. He also neither admits nor denies Mr. Rochell's claim that he threatened to "blow his fucking head off" after Mr. Rochell was on the ground with his hands behind his back and weaponless. *See id.*

What happened next is that Detective Ross decided to handcuff Mr. Rochell. The handcuffs were still in the truck, so Detective Ross asked Detective Brashear to stay with Mr. Rochell while he retrieved the cuffs. Detective Brashear did so, holding both of Mr. Rochell's hands. Detective Brashear testified that Mr. Rochell "wasn't being combative or anything at that point." (Doc. 53-10). Detective Ross holstered his weapon and returned

with the handcuffs. He secured them over Mr. Rochell's wrists and asked him his name. Mr. Rochell identified himself as "Johnnie Rochell L." (Doc. 53-1, p. 13).

Soon other officers arrived at the scene, and Mr. Rochell was placed in the back of a police vehicle. Police then attempted to confirm Mr. Rochell's identity and determine if he had a criminal record. Detective Robert Thorson, who had been part of the team of investigators surveilling the house on Mr. Rochell's street, arrived at around the time Detective Ross was handcuffing Mr. Rochell. Detective Thorson called Springdale police dispatcher Stacy Elliott and asked her to check the license plate of the car parked in Mr. Rochell's driveway. The vehicle was registered to a woman, so that information did not assist in the identification process. Detective Thorson next asked Ms. Elliott to check the history of the address for any males who matched Mr. Rochell's physical description, a Black male in his mid-30s. (Doc. 53-8, p. 7). After checking, Ms. Elliott confirmed that a person matching that description named Johnnie Rochell was listed as a resident of that address. Detective Thorson then asked Ms. Elliott to run Mr. Rochell's name and date of birth through the ACIC (Arkansas Crime Information Center) and NCIC (National Crime Information Center) databases to see if he had any warrant history or other criminal history. *Id.*

Ms. Elliott's ACIC search returned a two-page report, which the Court has received as part of the summary judgment record. (Doc. 54-2). Significantly, the top of the first page of the report identifies a *White* male named Johnny Wayne Russell, Jr., born October 27, 1977; and the next entry on the same page identifies a *Black* male named Johnnie Rochell, Jr., with the same date of birth. The face of the report therefore identifies *two*

7

*different individuals* with the same birthdate, not a single individual with an alias. The report includes only Mr. Rochell's photograph and lists only his past criminal offenses: two traffic-related misdemeanor offenses from 2009. *See* Doc. 54-2.

After viewing the ACIC report, Ms. Elliott reported to Detective Thorson over the radio that Mr. Rochell had no outstanding warrants, but that he *did* have State Identification ("SID") and Federal Bureau of Investigation ("FBI") "numbers." Detective Thorson asked her to run Mr. Rochell's "numbers" to see if he was a felon. Ms. Elliott testified that when a database search returns the name of a person with the same birthdate as the person being searched, police call this a "false hit." (Doc. 53-12, p. 4). When Ms. Elliott got a "false hit" on Johnny Wayne Russell, Jr., she unfortunately used his "numbers" to search for felonies. As a result, she falsely reported to Detective Thorson that Mr. Rochell had two felony-arson convictions out of Mississippi County, Arkansas, and McDonald County, Missouri. In actuality, those felony convictions were Mr. Russell's, not Mr. Rochell's. Still, the error had been unwittingly made, and Detective Thorson, having received confirmation of the felony record from dispatch, relayed this information to Detective Ross, who next placed Mr. Rochell under arrest for being a felon in possession of a firearm.

When Mr. Rochell was told why he was being placed under arrest, he immediately denied that he was a felon. He claims he "started laughing" and said, "Man, I don't have any felonies." (Doc. 53-1, p. 14). Mr. Rochell also claims that he was told by police that his alias was "Johnny Russell," and he adamantly denied this, too. *Id.* at 15.

After Mr. Rochell was arrested, he was taken to the Springdale Police Department. There, Detective Ross spoke with Mr. Rochell about "his" felony-arson convictions in

8

Arkansas and Missouri, and Mr. Rochell once again denied he was a felon. Detective Ross stepped into the area where Mr. Rochell was waiting to be booked and processed, and he spoke to Mr. Rochell about the details of the felony convictions, all the while holding the ACIC report that contained the "false hit" on Johnny Wayne Russell, Jr., a White male. Detective Ross admitted in his deposition: "I have never in my career ran an ACIC printout myself . . . . So I don't have a great understanding of it . . . ." (Doc. 53-7, p. 37). And although Detective Ross "may have even showed [Mr. Rochell] the ACIC report that showed the conviction," *id.* at 11-12, Mr. Rochell remained "very adamant that [the report] was not true," *id.* at 12. Detective Ross performed no further inquiries or investigations at that time and instead wrote up a report on the day's events. He did so even though he felt "there may have been some validity" to Mr. Rochell's denial that he had a felony record, given "the way [Mr. Rochell] was saying it." *Id.* Regardless of his qualms, Detective Ross arranged for Mr. Rochell to be transferred to the Washington County Detention Center ("WCDC"), where he was jailed on the charge of being a felon in possession. He spent the night in jail and was released on bond sometime later.

The day of the arrest was Friday, February 19, 2016. The following Monday, February 22, 2016, Detective Ross came to work concerned that perhaps he had made a mistake after all in Mr. Rochell's case. He decided to do some investigating. He began by approaching FBI Task Force officer Robert Hendrix and confessing his fears. He told Detective Hendrix that Mr. Rochell "may have a point and there's an identity issue somewhere in here," and that he "just want[ed] to make sure we did the right thing." *Id.* at 14. According to Detective Ross, Detective Hendrix helped him out by giving him "some

9

pointers . . . on websites to look at and databases to look into" to confirm his suspicions. *Id.* at 15. After some digging, Detective Ross realized that "[f]or some odd reason, when you run Mr. Rochell, this white male named Johnny Russell shows up." *Id.* at 17. Mr. Rochell's criminal record only contained "some misdemeanor charges"; whereas Mr. Russell's record contained felony-arson convictions. *Id.*

Detective Ross then "started looking at the criminal charge out of McDonald County[, Missouri]" that pertained to Johnny Russell, and he decided to call the sheriff's office there to inquire further. *Id.* He spoke by telephone to a McDonald County sheriff's officer and asked him to fax Mr. Russell's booking photo. Once the photo was faxed, Detective Ross examined it and determined the quality was too poor to be of any value. Detective Ross decided, "There's something wrong here and we need to figure it out," so he and another officer "just g[ot] in the car and dr[ove] to McDonald County and . . . look[ed] at the booking photo ourself [sic]." *Id.* at 18. Sure enough, when the officers viewed Johnny Russell's booking sheet, "it [was] obviously not Mr. Rochell. It [was] a white male holding a board that says Johnny Wayne Russell, same date of birth as Mr. Rochell." *Id.*

Armed with the knowledge that he had arrested Mr. Rochell for a crime he did not commit, Detective Ross returned to the Springdale Police Department and called the city prosecutor to explain that the felon-in-possession charge against Mr. Rochell should be dropped. He next called Mr. Rochell and told him he "did some digging" and "went around to other agencies" and had confirmed that the person who had the felony-arson conviction was "clearly not you." *Id.* at 19-20. He then invited Mr. Rochell back to the police station

10

to pick up his weapon, which had been confiscated during the arrest.

Instead of putting this case of mistaken identity behind him, the next thing Detective Ross did was confer with his supervisor to figure out how to charge Mr. Rochell with *something else*—albeit not a felon-in-possession charge. Detective Ross recounted in his deposition how he and his supervisor "broke out a[n] Arkansas criminal code book" and searched through it to determine what charge to use. *Id.* at 20. They hit upon the charge of "disorderly conduct" and then "approached our city prosecutor, Ernest Cate, and . . . said, 'Hey, this is what happened, we still think that there's a criminal act here but obviously a misdemeanor and not—certainly not a felony.'" *Id.* Detective Ross reasoned that Mr. Rochell must have been guilty of disorderly conduct because he had "caused alarm" and "was reckless" when he approached a legally parked car while carrying a rifle. *Id.* at 21. The prosecutor agreed to charge Mr. Rochell with disorderly conduct, and he was found guilty at a bench trial before Judge Jeff Harper in Springdale District Court on July 28, 2016. *See* Doc. 53-19. He was ordered to pay a fine of $250, costs of $100, $20 in city jail fees, and $20 in county jail fees. *Id.* He was also sentenced to 30 days in jail, which was suspended. *Id.*

Mr. Rochell now brings suit for the alleged violation of his constitutional rights pursuant to 42 U.S.C. § 1983 against Detective Ross, in both his individual and official capacities, for: (1) the use of excessive force in the course of Mr. Rochell's arrest, in violation of Mr. Rochell's Fourth Amendment right, (2) falsely arresting Mr. Rochell without probable cause, in violation of his Fourth and Fourteenth Amendment rights, and (3) falsely imprisoning Mr. Rochell, in violation of his Fourth and Fourteenth Amendment rights.

11

Detective Ross and Springdale argue in their joint Motion for Summary Judgment that Mr. Rochell has failed to identify any custom, policy, or practice of Springdale that was the moving force behind the constitutional violations alleged, and therefore, the official-capacity claims must be dismissed.

Detective Ross argues that if he placed the barrel of his weapon against the back of Mr. Rochell's head and threatened to "blow his brains out"—as Mr. Rochell claims he did—after Mr. Rochell was already on the ground, subdued, and cooperative, these acts were nonetheless appropriate under the circumstances and did not violate Mr. Rochell's constitutional rights. However, Detective Ross contends that if these acts did violate Mr. Rochell's rights, qualified immunity should apply to shield Detective Ross from liability.

As for Mr. Rochell's claim of false arrest, Detective Ross argues that he reasonably relied on the information relayed to him by police dispatch about Mr. Rochell having a felony record. He also points out that Mr. Rochell was ultimately charged and convicted of disorderly conduct for the events that took place on February 19, 2016, so Detective Ross believes that he had a good reason to arrest—and jail—Mr. Rochell that day, even if it was not for the crime of being a felon in possession.

Finally, Detective Ross contends that sending Mr. Rochell to the WCDC for the charge of being a felon in possession did not violate Mr. Rochell's constitutional rights, because Detective Ross had no duty to investigate Mr. Rochell's alleged felony conviction further at the police station. Even if he did violate Mr. Rochell's constitutional rights, however, he believes he is entitled to qualified immunity for the false imprisonment.

Below, the Court will consider the arguments for and against granting summary judgment on any of the official-capacity or individual-capacity claims. In doing so, the

Court will also analyze whether Detective Ross is entitled to qualified immunity on any of the individual-capacity claims asserted against him.

## II. LEGAL STANDARD

### A. Summary Judgment

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). And the Court will view the facts "in a light most favorable to the party opposing the motion [for summary judgment] and give that party the benefit of any inferences that logically can be drawn from those facts." *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997).

The party requesting summary judgment bears the burden of proving the absence of any material facts. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). If the moving party meets its burden, the nonmoving party must set forth "specific facts showing there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). "In order for there to be a 'genuine issue of material fact,' the evidence must be 'such that a reasonable jury court return a verdict for the nonmoving party.'" *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66-67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986)); *see also Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (stating that a factual dispute must be "outcome determinative" to bar summary judgment).

Moreover, the nonmoving party cannot rely on simple allegations or denials in the pleadings, and summary judgment should be granted if "any essential element of the prima

13

facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC,* 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). "The moving party is 'entitled to a judgment as a matter of law' [when] the nonmoving party [fails] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp.,* 477 U.S. at 323 (stating that the moving party does not have to negate the nonmoving party's claims in its motion).

## B. Qualified Immunity

When a government official, such as a police officer, is accused of violating an individual's constitutional rights, qualified immunity will shield that government official from liability unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). This is a two-step inquiry. In order for a plaintiff to overcome an officer's defense of qualified immunity, he must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't,* 570 F.3d 984, 988 (8th Cir. 2009). "Whether an officer is entitled to qualified immunity because he 'acted reasonably under settled law in the circumstances' is a question of law for the court, both before and after trial." *New v. Denver,* 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Hunter v. Bryant,* 502 U.S. 224, 228 (1991)). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson,* 133 F.3d

14

1125, 1128 (8th Cir.1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The question is whether the law gave the officials 'fair warning that their alleged conduct was unconstitutional.'" *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009) (quoting *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir. 2008)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229 (quotation omitted). With respect to a claim for excessive force, "[t]he question for the jury is whether, judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of the force used." *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990). In order to evaluate whether the use of force was reasonable, the Court should consider "the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest." *Id.* "Additionally, we must judge the reasonableness of the Officers' conduct from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and with 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Howard*, 570 F.3d at 989 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

With respect to a claim for false arrest, if the arresting officer lacks both an arrest warrant and probable cause to arrest, qualified immunity will shield him when "a

15

reasonable officer could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officer[ ] possessed." *Hunter*, 502 U.S. at 227. "[T]he issue for immunity purposes is not probable cause in fact but *arguable probable cause*, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996) (emphasis added and quotation omitted), *cert. denied*, 519 U.S. 1011 (1996). When an officer arrests an individual due to a mistake of fact, the Court must look "at the totality of the circumstances surrounding the arrest to determine its reasonableness." *Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir. 2003).

Finally, with respect to a claim for false imprisonment, the case law rarely distinguishes this claim from that of false arrest. Indeed, neither party briefed the issue of false imprisonment as distinct from the claim for false arrest; therefore, the question of Detective Ross's qualified immunity for the claim for false imprisonment should be analyzed in largely the same way as the claim for false arrest. The factual wrinkle in this case, however, is that Mr. Rochell was arrested without a warrant, based on identifying information that was later proven to be false. Under those circumstances, the Court must ask whether qualified immunity should continue to protect the officer's conduct past the point of arrest, and continuing through the suspect's imprisonment at the local jail. The salient question appears to be: At what point, if any, does an officer owe a duty to investigate in order to be certain that the basis on which a warrantless arrest was made was correct?

## III. DISCUSSION

16

## A. Official-Capacity Claim

The Court begins its discussion with Mr. Rochell's official-capacity claim. The Amended Complaint and Response to the Motion for Summary Judgment both fail to identify any custom, policy, or practice of the City of Springdale that was the moving force behind the violation of any constitutional rights. The law is clear that a municipality cannot be held vicariously liable under a theory of *respondeat superior* for its employees' unconstitutional acts. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Here, Mr. Rochell has alleged that certain police officers made various mistakes that led to him being arrested for being a felon in possession, and that Detective Ross took certain actions in the commission of that arrest and later imprisonment that violated Mr. Rochell's constitutional rights. Because no genuine, material dispute of fact exists as to any official-capacity claim, Springdale is entitled to summary judgment and will be dismissed from the lawsuit.

## B. Individual-Capacity Claims

### 1. Excessive Force

The Court finds that there remain genuine, material questions of fact as to whether Detective Ross used excessive force during the arrest of Mr. Rochell, and thereby violated his constitutional rights. Detective Ross initially pointed his service weapon at Mr. Rochell in order to induce him to drop his own weapon, an AR-15 rifle that was mounted on a strap and slung around Mr. Rochell's body. However, once Mr. Rochell placed his rifle on the ground—slowly and appropriately, by Detective Ross's own admission—and stepped away from it—purposely, as confirmed by Detective Brashear—the threat level may have

17

changed. Detective Ross contends, and Mr. Rochell agrees, that at first, Mr. Rochell failed to obey the command to get to the ground after dropping the weapon. With that said, however, Detective Ross agrees that at that moment, Mr. Rochell was not being argumentative, violent, or combative. Detective Brashear's testimony confirms that account.

Viewing the facts in the light most favorable to Mr. Rochell, after he was disarmed, with his weapon on the ground several feet from him, and he was lying on the ground with his hands behind his back, posing no threat to anyone, Detective Ross then pressed his weapon "behind [Mr. Rochell's] right ear" and screamed, "I'll blow your fucking brains out if you ever approach me like that again!" (Doc. 53-1, p. 7). For his part, Detective Ross does not recall specifically what he said once Mr. Rochell went to the ground, but he does remember screaming at Mr. Rochell and admits that he pointed his gun at Mr. Rochell "when he was on the ground," at "[a]lmost point blank" range, (Doc. 53-7, p. 29), and that it was "[v]ery likely" that he placed the barrel of his pistol directly against Mr. Rochell, just as Mr. Rochell claims he did, *id.* at 30. Detective Ross neither admits nor denies that he then threatened to "blow [Mr. Rochell's] fucking head off." *Id.*

Under these facts, Mr. Rochell has constructed a triable claim for excessive force that should be presented to a jury. "[U]se of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "In recognizing these excessive-force claims, the courts have distinguished the need for an initial show of force that is reasonable under the circumstances from a continued showing of force once the situation is under control." *Merrill v. Schell*, 2017 WL 3726969, at *7 (W.D.N.Y Aug. 30, 2017) (referencing *Binay v.*

18

*Bettendorf*, 601 F.3d 640, 649-50 (6th Cir. 2010)). The Eighth Circuit has held that when an officer simply draws his gun and points it at a subject, without any indication that the officer intends to fire the gun, this "does not rise to the level of a constitutional violation." *Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir. 1995). However, in the case at bar, under the facts alleged by Mr. Rochell, Detective Ross pointed his weapon at Mr. Rochell in a manner that would tend to indicate: (1) that he intended to fire the gun and (2) that he intended to kill Mr. Rochell.

The First Circuit has explained a "straightforward rule" that every police officer should be well familiar with: that "pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation." *Stamps v. Town of Framingham*, 813 F.3d 27, 42 (1st Cir. 2016). Under the circumstances asserted by Mr. Rochell, Detective Ross could not have reasonably believed it was necessary to place a loaded weapon at Mr. Rochell's head and then threaten to kill him, absent any risk of threat or danger to Detective Ross or to anyone else. Threatening to kill an individual who is in custody, in the manner and under the circumstances alleged by Mr. Rochell, must be reasonably justified by a legitimate law-enforcement purpose in order to comply with the law. Here, Detective Ross has not presented the Court with any legitimate law-enforcement justification for this conduct.

Judge Lawrence J. Vilardo of the Western District of New York has helpfully collected a number of cases from several circuits involving police officers' use of force. *See Merrill*, 2017 WL 3726969, at *7 (collecting cases). What the cases have in common is that they all attempt to articulate exactly when a police officer's use of a loaded firearm

19

on an individual may constitute excessive force, even in the absence of any injury. In the

Tenth Circuit's opinion in *Holland ex. rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193

(10th Cir. 2001), *cert. denied*, 535 U.S. 1056 (2002), the Court explained:

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

Similarly, in the Ninth Circuit's opinion in *Tekle v. United States*, 511 F.3d 839, 847 (9th Cir.

2007), the Court reiterated its view that "pointing a gun at a suspect's head can constitute

excessive force in this circuit." And the Seventh Circuit reminded courts that they are to

look "to whether the force used to seize the suspect was excessive in relation to the danger

he posed—to the community or to the arresting officers—if left unattended." *McDonald v.

Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992). When considering the amount of force

alleged by Mr. Rochell to have been used by Detective Ross, and balancing that force

used against the need for such force at the time, the Court believes a reasonable jury

could find that a constitutional violation occurred.

As for the issue of Detective Ross's entitlement to qualified immunity, this protection

will be denied. Although there does not appear to be a case in this Circuit with exactly the

same fact-pattern alleged here, the Court finds, nonetheless, that the law was clearly

established at the time of these events that an officer who threatens to kill an individual

who is lying on the ground, weaponless, cooperative, and posing no danger to the officer

or to others, may violate the individual's Fourth Amendment rights. The Court agrees with

the Eleventh Circuit that when "conduct lies so obviously at the very core of what the

20

Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the defense of qualified immunity will not apply. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997); *cf. Hawkins v. Holloway*, 316 F.3d 777, 787-88 (8th Cir. 2003) (denying qualified immunity to a sheriff who expressed frustration with his employees by pointing his loaded weapon at them and threatening to shoot them, as the sheriff's "alleged conduct was so far beyond the bounds of the performance of his official duties that the rationale underlying qualified immunity is inapplicable," and any law enforcement officer would have had "fair warning" that such conduct would violate an individual's constitutional rights); *Mountain Pure, LLC v. Roberts*, 27 F. Supp. 3d 962, 972 (E.D. Ark. 2014) ("Pointing guns at persons who are compliant and present no danger is a constitutional violation that appears to be clearly established.") (citing *Baird v. Renbarger*, 576 F.3d 340, 346–47 (7th Cir. 2009)). Summary judgment is therefore denied as to the excessive-force claim.

## 2. False Arrest

In the case at bar, the parties agree that when Mr. Rochell was arrested for being a felon in possession of a firearm, the officers at the scene had received incorrect information as to Mr. Rochell's criminal history, and they had relied on that incorrect information in determining there was probable cause to arrest Mr. Rochell. In fact, there was no actual probable cause to arrest Mr. Rochell for being a felon in possession. Furthermore, Mr. Rochell was not arrested at the scene or even later that day on any other charge other than being a felon in possession. The fact that Detective Ross and his supervisor were ultimately successful in persuading the city prosecutor to issue a citation

21

to Mr. Rochell for disorderly conduct *one week after the incident at issue* has absolutely nothing to do with whether probable cause existed to arrest him *for being a felon in possession*. That conviction for disorderly conduct does not retroactively absolve Detective Ross of liability for the false arrest.[3]

Next, the Court must consider whether Detective Ross is entitled to qualified immunity for the arrest. The Eighth Circuit in *Williams v. Decker*, 767 F.3d 734, 743 (8th Cir. 2014), held that when a police officer confirms with dispatch a suspect's prior felony conviction, this confirmation creates at least "arguable probable cause" to arrest and entitles the arresting officer to qualified immunity. Even when a suspect tells the arresting officers that their information is faulty and that he has not been convicted of a felony, it is "objectively reasonable for the officers to rely on [the suspect's] criminal history as reported and confirmed to them by a police dispatcher." *Id.*

In the case at bar, Ms. Elliott, the police dispatcher, relayed to Detective Thorson her confirmation, based on her interpretation of an ACIC report, that Mr. Rochell had a past felony conviction for arson. Even though she was incorrect in her assessment, Detective

---

[3] Detective Ross makes this very argument, that Mr. Rochell's "claims of false arrest"—and of false imprisonment, presumably—"are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)," because the *Heck* rule bars a claimant from bringing a Section 1983 civil action for damages when doing so calls into question the validity of a state-court conviction. *See* Doc. 52, p. 13. In other words, Detective Ross contends he is entitled to summary judgment on both the false arrest and false imprisonment claims because to find otherwise would call into question the validity of Mr. Rochell's conviction for disorderly conduct. The Court disagrees. The conviction for disorderly conduct would not be called into question if a jury found that Detective Ross improperly arrested and imprisoned Mr. Rochell for being a *felon in possession*—the *only* charge that was levied against him on the date of his arrest, and the only legal basis for which he was incarcerated at the WCDC that same day. The felon-in-possession charge was later dropped and never pursued, but the separate citation for disorderly conduct was issued approximately a week after the arrest in question.

22

Thorson reasonably relied on it, and so did Detective Ross. Because qualified immunity protects Detective Ross for the false arrest, this claim is dismissed with prejudice.

### 3. False Imprisonment

The last issue the Court confronts is whether Detective Ross is entitled to qualified immunity for his decision to send Mr. Rochell to jail on the charge of being a felon in possession. The facts are undisputed that when Detective Ross arrived at the police station, he obtained a copy of the ACIC report that contained the false information about Mr. Rochell's criminal history, which, in turn, formed the sole basis for arresting Mr. Rochell for being a felon in possession. At what point was it incumbent upon Detective Ross to carefully examine the ACIC report and make certain that the report was correct and contained a true record of Mr. Rochell's prior felony? The law does not answer that question with certainty, but all parties here agree that Mr. Rochell disputed that he had a felony conviction from the time Detective Ross first informed him of it, and Mr. Rochell continued to dispute it after he arrived at the police station—so much so that Mr. Rochell's protests caused Detective Ross to question whether the evidence against him was correct. Detective Ross testified that at the police station, Mr. Rochell was "very adamant" that the ACIC report was false when Detective Ross showed it to him. (Doc. 53-7, p. 12). And "the way" in which Mr. Rochell was denying the felony convictions—forcefully, yet "respectful[ly]," made Detective Ross feel "there may have been some validity to [Mr. Rochell's denials]." Id.

Even though Detective Ross harbored doubts as to Mr. Rochell's guilt—and by extension, the accuracy of the ACIC report that was the source of information confirming

23

his guilt—Detective Ross conducted no further investigation to verify his suspicions. Even a cursory inspection of the ACIC report that Detective Ross held in his hands would have revealed the felony criminal history that was listed there belonged to a *White* man named Johnny Wayne Russell, Jr.; whereas Detective Ross had in his custody a *Black* man named Johnnie Rochell, Jr.[4] Exigent circumstances do not explain Detective Ross's failure to take a second glance at the top of the first page of the ACIC report and question the validity of the "false hit" on Johnny Russell prior to approving Mr. Rochell's transport to the WCDC. For some reason that remains unexplained, Detective Ross put off performing any investigative police work until several days after Mr. Rochell went to jail. When he finally set his mind to the task of verifying the conviction, Detective Ross was able to confirm Mr. Rochell's innocence, have the charge against him dropped, and call him personally to apologize, all within a single day.

The facts as set forth above, and viewed from the perspective of Mr. Rochell, establish that there is a genuine, material dispute as to whether Mr. Rochell was falsely imprisoned. The tort of false imprisonment under Arkansas law is "the unlawful violation of the personal liberty of another consisting of detention without sufficient legal authority." *Headrick v. Wal–Mart Stores, Inc.*, 293 Ark. 433, 435 (1987). Detective Ross is not entitled to qualified immunity for the charge of false imprisonment because his conduct, viewed in the light most favorable to Mr. Rochell, violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Detective Ross admits that he doubted Mr. Rochell's

_____

[4] This factual situation raises questions about the reasonableness of Detective Ross's actions, as well as his competence.

guilt at the time he was being booked but sent him to the WCDC anyway.

Although "[t]he law does not require law enforcement officers to conduct a perfect investigation to avoid suit for false arrest," *Joseph v. Allen*, 712 F.3d 1222, 1228 (8th Cir. 2013), it stands to reason that if intervening events occur between the subject's arrest and his imprisonment, a court should consider: (1) whether a reasonable officer would have found those intervening circumstances to be cause for further investigation, and (2) whether, under the circumstances, the failure to conduct further investigation would have violated the subject's constitutional rights. Considering Detective Ross's admitted knowledge and conduct, the Court finds that a police officer in possession of the same facts and suspicions as Detective Ross would not have found it reasonable to delay further investigation.

It also strikes the Court that Detective Ross's apparent lack of training regarding generating and analyzing ACIC reports, as well as his apparent inability to conduct database searches without others' help, reveals his lack of competence at these particular tasks, and is yet another justification for denying him qualified immunity for this cause of action. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (finding that an officer who is negligent or mistaken should receive qualified immunity, but one who is "plainly incompetent" should not).[5]

For example, Detective Ross admitted in his deposition that even though he relied

---

[5] The Court does not mean to imply that Detective Ross is generally an incompetent police officer; rather, his own deposition testimony has raised a question of fact as to whether his skills in analyzing ACIC reports and performing follow-up database searches are substandard and not commensurate with the skills typically possessed by a reasonable officer.

entirely on the ACIC report to charge Mr. Rochell with a crime, he had never personally run an ACIC report before, did not "have a great understanding" of what an ACIC report was or how to read an ACIC printout, (Doc. 53-7, p. 37), and when he finally decided to investigate Mr. Rochell's criminal history, he relied on another officer for "pointers . . .on websites to look at and databases to look into," *id.* at 15. A reasonable jury could find that even though Detective Ross questioned Mr. Rochell's guilt at the police station, he did not behave reasonably in failing to conduct any investigation—either due to his lack of research skills, his lack of training in reading ACIC reports, and/or his eagerness to return to the field and complete the surveillance mission that Mr. Rochell's arrest had interrupted. For all of these reasons, the Court denies summary judgment on the false-imprisonment claim.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants City of Springdale, Arkansas' and Detective Cody Ross's Motion for Summary Judgment (Doc. 51) is **MOOT IN PART, GRANTED IN PART, AND DENIED IN PART**. The Motion is **MOOT** as to all claims that were dismissed without prejudice due to the parties' Amended Joint Stipulation (Doc. 64). The Motion is **GRANTED** as to the official-capacity claim against Defendant Springdale, and Springdale is **DISMISSED WITH PREJUDICE**; and the Motion is further **GRANTED** as to the individual-capacity claim against Detective Ross for false arrest, and this claim is **DISMISSED WITH PREJUDICE**. The Motion is **DENIED** as to the individual-capacity claims against Detective Ross for excessive force and false imprisonment.

**IT IS SO ORDERED** on this 25 day of October, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

26